IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

CINDY L. CHILDERS,

                   Plaintiff,

v.                                           CIVIL  ACTION  NO.  3:12-0077

UNITED OF OMAHA LIFE
INSURANCE COMPANY, et al.,

                   Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are cross-motions for summary judgment filed by Plaintiff Cindy Childers (ECF No. 44) and Defendant United of Omaha Life Insurance Company ("United") (ECF No. 51); these motions relate to Plaintiff's claim for long-term disability benefits.  Also pending are cross-motions for summary judgment filed by Plaintiff (ECF No. 46) and Defendants Cabell Huntington Hospital and the Cabell Huntington Hospital Short-Term Disability Income Plan for the Class I Employees (collectively, "CHH") (ECF No. 49); these cross-motions relate to Plaintiff's claim for short-term disability benefits.  Because these motions for summary judgment concern the same factual background (namely, Plaintiff's medical history, alleged disability, and claim for benefits), the Court will address them together in a single opinion.

For the reasons discussed below, the Court **GRANTS** Defendant United of Omaha's motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment against United.  Additionally, the Court **GRANTS** the CHH defendants' motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment against the CHH defendants.

# I.    BACKGROUND

## A.    Plaintiff's Employment and Medical History

Plaintiff is a West Virginia resident formerly employed by Cabell Huntington Hospital as a Certified Registered Nurse Anesthetist ("CRNA"). She began working at Cabell Huntington Hospital in April 2005. LTD AR 726.[1] As a CRNA, Plaintiff was required to "perform[] clinical anesthesia duties according to prescribed standards, operate[] and monitor the function of anesthesia machines, monitors, analyzers, emergency and other equipment;" instruct student anesthetists; and "supervise[] the ordering, receiving, . . . inspection, distribution and safe use of materials and supplies." LTD AR 684.

Plaintiff first reported suffering serious medical symptoms years before she began working at Cabell Huntington Hospital. In March 2001, Plaintiff sought treatment for several neurological symptoms and hypertension. LTD AR 587. Dr. Craig Morgan, an ophthalmologist, examined Plaintiff on March 21, 2001, for her complaints of decreased vision in her left eye and neurological symptoms affecting the left side of her face. LTD AR 484. At that time, she reported left-sided facial numbness and weakness, and also weakness in her hands. LTD AR 484. Dr. Morgan diagnosed Plaintiff with optic neuritis. Despite the fact that an MRI performed in 1999 or 2000 was normal, he referred her to a neurologist for follow-up testing, based on his suspicion that Plaintiff may have multiple sclerosis. LTD AR 484.

At that time in 1999, Plaintiff had recently begun working as a nurse anesthetist in Charleston, West Virginia. LTD AR 338. She accepted that position after quitting her previous employment as a nurse anesthetist for Huntington Anesthesiologist Group, due to her

---

[1] Defendants United and CHH each submitted administrative records in this case. Citations to the administrative record for the long-term disability claim will be designated as "LTD AR __." This corresponds to the record filed by United at ECF No. 26. Citations to the administrative record for the short-term disability claim will be designated as "STD AR __." This corresponds to the record filed at ECF No. 23.

experiencing "extreme fatigue, migraines, muscle weakness and short term memory problems." LTD AR 338.  She believed that she would feel better physically and do better in her new position, with its shorter hours.  LTD AR 338.

Plaintiff continued to experience "chronic fatigue, neurological symptoms and migraine headaches" throughout her employment in Charleston from 1999 to 2005.  LTD AR 338. Plaintiff reported these symptoms to her primary physician, Dr. David Patick, who also treated Plaintiff for hypertension.  LTD AR 587.  Plaintiff reported to Dr. Patick that she experienced fatigue, especially when exposed to heat, generalized aches, and spells of left facial numbness and twitching.  LTD AR at 587, 589.  Dr. Patick's examination revealed "diminished fine motor skills in the hands with diminished ability to grasp."  LTD AR 590.  In a follow-up appointment with Dr. Patick in May 2001, Plaintiff again reported feeling very fatigued, but that she also felt better emotionally due to anxiety medications.  LTD AR 591.  Dr. Patick suspected a demyelinating disease, but noted that her Lyme titers were negative and an MRI of her head did not show any indication of such a disease.  LTD AR 591.  One month later, in June 2001, Plaintiff reported continued neurological symptoms with numbness in her left leg and back spasms.  She also reported limiting her schedule to 40 hours per week.  LTD AR 592.

In August 2001, Plaintiff consulted with Dr. Stephen Zekan, M.D., F.A.C.S., a general surgeon in Charleston, West Virginia.  Dr. Zekan ordered a blood test for Lyme disease, called a Lyme IgG Western Blot.  The test was performed by IGeneX, Inc.  LTD AR 648.  The test examined Plaintiff's blood for the presence of IgG and IgM antibodies, which are indicative of the presence of the bacteria that causes Lyme disease.  The results indicated that the test was positive according to IGeneX's criteria.  According to criteria promulgated by the Centers for Disease Control ("CDC"), however, the test was not positive.  LTD AR 477-78.  Based on these

results, Dr. Zekan nonetheless diagnosed Plaintiff with Lyme disease.  LTD AR 482.  He prescribed intravenous antibiotics and surgically inserted an intravenous port in Plaintiff's chest for the administration of the drug.  LTD AR 479.  Plaintiff received intravenous antibiotics for approximately one year.  LTD AR 645-46.  After that, she switched to oral antibiotics.  In October 2002, Plaintiff reported that she was feeling better, though she still felt fatigued.  LTD AR 645.

Plaintiff continued to consult Drs. Patick and Zekan in 2005, after she began working at Cabell Huntington Hospital.  She visited Dr. Zekan for follow-up appointments for her Lyme disease diagnosis.  During a June 2005 appointment, Plaintiff complained of numbness in her thigh and joint pain.  LTD AR 639.  She also reported that her fatigue was not as bad.  LTD AR 639.  In November 2005, Plaintiff reported to Dr. Zekan that she was "feeling good," especially after discontinuing certain cholesterol medication, which she associated with muscle pain and weakness.  LTD AR 638.  Dr. Zekan noted that Plaintiff would start taking additional antibiotics as part of her treatment for Lyme disease.  LTD AR 638.  Plaintiff also continued to see Dr. Patick for follow-ups regarding her hypertension, hyperlipidemia and general medical problems.  LTD AR 595.  Dr. Patick observed some orthopedic developments, including "degenerative changes," but noted that otherwise, her laboratory work presented no concerns.  LTD AR 595.  In a visit later that year, Dr. Patick noted that Plaintiff was working full time at Cabell Huntington Hospital.  LTD AR 597.

Plaintiff was still working at Cabell Huntington Hospital when she next visited Dr. Patick in March 2006.  Dr. Patick noted that Plaintiff's employment as a nurse "seem[ed] to be working out."  LTD AR 599.  Plaintiff visited Dr. Patick three times for follow-ups in 2007.  Given her reported symptoms, Dr. Patick believed she suffered from genetic hyperlipidemia, chronic pain

syndrome, and chronic anxiety.  LTD AR 600.  Dr. Patick adjusted her cholesterol medication after Plaintiff complained of muscle aches.  Plaintiff also reported feeling weak, especially in her right leg.  LTD AR 602.  Nonetheless, Plaintiff again reported that her work as a nurse anesthetist was working out.  LTD AR 602.  In 2008, Plaintiff's symptoms appeared to be under control.  Plaintiff visited Dr. Patick three times that year for follow-up appointments.  LTD AR 605, 613, 614.  At those examinations, Plaintiff reported no new specific complaints.  Dr. Patick noted that she was compliant with her medications.  LTD AR 605.  She had elevated liver functions on her cholesterol medication, but later switched medications with success.  LTD AR 613.  In October 2008, however, Plaintiff reported to Dr. Zekan that her Lyme disease had gotten worse, causing her to reduce her hours at work.  LTD AR 621.  Dr. Zekan instructed her to continue taking her antibiotic medications.  LTD AR 621.

Plaintiff routinely consulted with her physicians in 2009.  She saw Dr. Patick for follow-up visits three times that year.  LTD AR 608, 609-10, 611-12.  She reported that she continued to do well on her medications and Dr. Patick's physical examinations revealed no significant deficiencies.  In March 2009, she reported to Dr. Patick that she still worked "as a [nurse] anesthetist at Cabell and stays busy."  LTD AR 611.  In October 2009, however, she did note that she had been more fatigued lately and that she had some "atypical chest pain not related to exertion."  LTD AR 608.  Dr. Patick recommended she undergo a cardiac stress test.  Plaintiff performed well in a stress test administered in January 2010.  The physician noted, "[Plaintiff's performance on] the treadmill demonstrates excellent exercise tolerance," and revealed no other cardiac problems.  LTD AR 544.

In October 2009, Plaintiff also followed up with Dr. Zekan, to whom she reported that her arthritis symptoms were so bad that she could not function, and she had less energy.  LTD

AR 623.   In addition to prescribing medication for joint pain and fatigue, he recommended a sleep apnea study.   A study was conducted in November 2009, after which Plaintiff was diagnosed with moderately severe obstructive sleep apnea.   LTD AR 572.   She was fitted for a CPAP machine in February 2010 to alleviate the sleep apnea and after months of use reported not feeling as tired and no difficulty getting going in the morning.   LTD AR 564.

Plaintiff visited Dr. Zekan twice in 2010, reporting worsening symptoms.   LTD AR 480. In February 2010, Plaintiff complained of muscle soreness and swelling.   She stated that she had problems working forty hours per week.   On July 8, 2010, Plaintiff reported to Dr. Zekan that she was feeling tired all over.   The heat also bothered her, and she could not drive.   Dr. Zekan noted that Plaintiff was on antibiotics, Zoloft, and Xanax.   Plaintiff reported that when she took Rocephin (an antibiotic), her "mind seems a lot clearer."   LTD AR 480.   Plaintiff's last day working at Cabell Huntington Hospital before claiming disability was July 16, 2010.

### B.        Short-Term Disability Claim

As a full-time CRNA at Cabell Huntington Hospital, Plaintiff was covered under an employee benefit plan providing short-term disability benefits ("STD Plan").   The STD Plan is self-funded by CHH.   Ex. A. at 24, CHH Mem. in Supp. Mot. Summ. J., ECF No. 49-1. Pursuant to an Administrative Services Agreement ("ASA") effective January 2009, the Life Insurance Company of North America, a CIGNA company ("CIGNA"), acted as the Plan Administrator.   STD AR 1-13.

On July 26, 2010, Plaintiff contacted CIGNA to apply for short-term disability benefits. STD AR 129-35.   She reported that the last day she was able to work was July 16, 2010.   STD AR 130.   Plaintiff claimed that she was disabled by an illness, diagnosed as "Tertiary Lyme Disease."    STD AR 131.   She identified her other medical conditions as hypertension,

hypothyroidism, sleep apnea, and depression.  STD AR 131.  CIGNA requested the names of Plaintiff's healthcare providers.  She named Dr. Patick and Dr. Zekan as her treating physicians.

CIGNA contacted Plaintiff on August 2, 2010, to notify her that it was unable to make a determination on her STD claim and it needed additional information.  STD AR 146.  CIGNA also contacted Drs. Patick and Zekan to ask for information to support Plaintiff's claim, including office notes, test results, treatment plans, and restrictions to returning to work.  STD AR 152, 156.  Dr. Patick completed CIGNA's physician statement form and submitted office notes and test results as requested.  He listed the primary diagnosis as Lyme disease, and additional relevant factors as weakness, fatigue, muscle aches, insomnia, sleep apnea, and dysphagia.  STD AR 467.  He also noted that he had treated Plaintiff for these conditions on an ongoing basis since 2004.  STD AR 467.

Dr. Zekan also submitted Plaintiff's medical information in response to CIGNA's request.  Like Dr. Patick, Dr. Zekan also listed Lyme disease as the primary diagnosis.  He reported that other factors affecting her ability to return to work included "severe fatigue, mind foggy and unclear, hypertension, can't think clearly, depression, dizziness."  STD AR 518.  He indicated on the form that he first treated Plaintiff "for this current impairment episode" in August 2001.  STD AR 518.  Dr. Zekan did not indicate a specific date on which Plaintiff would be able to return to work.  He merely stated that she was "unable to work till symptom[s] get better."  STD AR 518.

CIGNA assigned Plaintiff's claim to two of its internal reviewers: Nurse Case Manager Crystal Maynard, STD AR 98-100, and Medical Director Dr. Norton Hall, M.D., STD AR 466.  Nurse Maynard's role appears to have been primarily to gather additional information from Plaintiff and her physicians.  She did not render an opinion as to whether Plaintiff qualified for

STD benefits.  Dr. Hall, however, did render such an opinion.  In a brief memorandum dated August 19, 2010, Dr. Hall stated that his review of the provided medical records "revealed no current serologic studies regarding Lyme disease or Ehrlichiosis.  The most current studies submitted are from 2001."  STD AR 466.  He further observed:

> The office notes of the attending physician, Dr. Patick, are devoid of any documented, significant, quantified, positive, clinical finding, functional loss or physical impairment.
>
> There is no office note, letter, Medical Request Form from the infectious disease specialist who is referenced in the file but not identified.
>
> There is no lumbar puncture with recorded pressures and analysis of the cerebrospinal fluid on file.  There is no current imagery study on file.  The most recent brain . . . MRI study is dated 2/29/08 and was read as normal.
>
> Thus, it is concluded, with reasonable medical certainty, that the imposed restrictions are not supported.

STD AR 466.

CIGNA denied Plaintiff's claim for STD benefits on August 20, 2010.  STD AR 136.  In the denial letter, CIGNA itemized the records it reviewed in reaching its decision and summarized the medical evidence it received from Plaintiff's treating physicians.  CIGNA concluded that "the medical records on file fail to document a functional impairment to support the imposed restrictions and limitations placed on [Plaintiff] per [her] physician."  STD AR 138.  Despite Plaintiff's reported symptoms of fatigue and muscle ache, CIGNA found "no definitive treatment plan noted on file."  Moreover, Plaintiff had "not been referred to physical therapy or . . . to an infectious disease specialist for [her] condition."  STD AR 138.  Although Dr. Zekan observed in a July 2010 office visit that Plaintiff had a recurrence of Lyme disease, the most recent diagnostic test for Lyme disease was performed in 2000 and Plaintiff reported feeling

much better when taking Rocephin.  STD AR 138.  After its investigation of Plaintiff's claim,

CIGNA ultimately concluded that Plaintiff was not entitled to STD benefits.  It stated:

> After reviewing the medical documentation, there are no objective medical findings to supports [sic] subjective complaints of your symptoms that show a functional impairment.  To date, there are no current diagnostic test results on file regarding your Lyme disease, no definitive treatment plan in place, and no specific clinical exam findings to show a functional loss or physical impairment that precludes you from working at your occupation.
>
> Therefore, it has been determined that you do not meet the definition of disability as defined by your plan.  We must regretfully advise you that your claim for Short Term Disability benefits has been denied and we are unable to approve you for STD benefits.  Please understand that we are in no way stating that your condition does not exist.  Rather we are stating that the medical information submitted by your physician and reviewed with our staff, does not document how your condition would prevent you from performing your occupation as of July 17, 2010.

STD AR 138.  CIGNA also advised Plaintiff of her right to appeal its decision.

Plaintiff appealed the denial of her claim on August 27, 2010 and submitted additional

medical records to support her claim.  STD AR 344.  CIGNA acknowledged receipt of Plaintiff's

appeal on September 1, 2010.  STD AR 172.  CIGNA advised Plaintiff that "[a]ny additional

information submitted may impact the appeal decision," and it was therefore important for

Plaintiff to "carefully review the . . . original denial letter . . . to ensure that any and all available

medical or other documentation related to your claim has been submitted."  STD AR 172.

Plaintiff contacted CIGNA to seek an extension of time for Plaintiff to provide additional

medical records, in light of Plaintiff's upcoming medical appointments.  CIGNA agreed and

allowed Plaintiff until October 11, 2010 to submit any additional records Plaintiff wanted

CIGNA to consider when evaluating her claim on appeal.  STD AR 170, 169.  On October 11,

2010, CIGNA confirmed it had received the supplemental records from Plaintiff.  STD AR 74.

CIGNA considered the supplemental information on appeal.  STD AR 73, 165.

CIGNA referred Plaintiff's appeal to Nurse Case Manager Megan Mielke and Dr. Nick Ghaphery, D.O.[2]  It appears from the record that Nurse Mielke reviewed the file on September 1, 2010, and thus the only new medical information for her to review was what Plaintiff included with the notice of appeal.  Nurse Mielke concluded that the new information did not change the recommendation to deny STD benefits.  STD AR 85.  Dr. Ghaphery reviewed the file on October 15, 2010, which included supplemental information Plaintiff submitted after Nurse Mielke's review.  Dr. Ghaphery similarly concluded that Plaintiff's work restrictions and limitations were not supported.  STD AR 71.  He observed:

> -Office notes dated 6/25/2010 and 7/8/2010 by Dr. Patich [sic], internist, do not demonstrate measurable loss of strength.
> -No informal or formal assessment of neurocognitive function is presented by any of the treating physicians.
> -Office note from Dr. Robinson dated 8/24/2010 indicates normal movement of all extremities, normal extremity strength, normal sensation, and no reported evidence of cognitive impairment.

STD AR 71.

On October 15, 2010, CIGNA upheld its denial of Plaintiff's claim.  STD AR 165.  The denial letter reviewed the relevant plan language defining disability, and identified the additional medical records Plaintiff provided for review of her appeal.  The letter explained:

> Your records indicated you were diagnosed with [L]yme disease in 2001.  It was unclear what had changed in your condition at the time you went out of work.  The office notes dated 6/25/10 and 7/8/10 by Dr. Patich [sic] . . . did not demonstrate measurable loss of strength.  There was no informal or formal assessment of neurocognitive function by any of the treating physicians. . . .  While we

---

[2] In its brief, CHH asserts that Nurse Case Managers Maynard and Mielke, along with medical associates Dr. McCool and Dr. Hall reviewed Plaintiff's claim on appeal.  The record, however, does not support this statement.  An "Appeal Referral" form does include a note that the claim was reviewed by these four individuals.  STD AR 81.  The Court believes, however, that the note refers to Nurse Maynard and Dr. Hall's initial review of Plaintiff's claim.  It appears that Dr. McCool did not review Plaintiff's claim at any stage.  STD AR 84 (indicating that referral to Dr. McCool was not accepted by him).  The record indicates that only Nurse Mielke and Dr. Nick Ghaphery, D.O. reviewed Plaintiff's claim during the first appeal.

> understand you had reported symptoms of fatigue and weakness, the medical information on file does not support the severity of a disabling condition.
>
> In summary, in order for Short Term Disability benefits to be considered, we need to establish a condition or combination of conditions that precluded you from performing the demands of your occupation as of 7/17/10.  There was no clinical evidence on file to support a loss of function.

STD AR 166.  The letter concluded by notifying Plaintiff of her right to initiate a second appeal of the decision.

Plaintiff requested a second appeal of her claim on November 1, 2010.  STD AR 319. CIGNA gave Plaintiff until November 25, 2010, to submit additional records in support of her claim.  STD AR 163.  Plaintiff submitted the results of an MRI of her brain, which was performed on October 20, 2010.  The radiologist interpreted the results, finding "no acute process" and concluding it was a "normal MRI of the brain with and without contrast."  STD AR 320.  Plaintiff also submitted testimonial letters from treating physicians and former colleagues. These included letters from Dr. Jeffrey Darnall, M.D., an infectious disease specialist, STD AR 341 ("The above patient is unable to work due to cognitive dysfunction, which is presumed secondary to Lyme Disease."); Dr. Patick, STD AR 309 ("Mrs. Childers is unable to work due to numbness and loss of control of her left knee.  She has constant muscle weakness involving the legs and weakness in the arms along with intermittent hand swelling and chronic fatigue."); Dr. R. Arturo Roa, M.D., STD AR 308 ("I fully support [Plaintiff's] medical claims and can attest to her severe debilitation as a result of her Lyme Disease.  I can attest to her character and if she was able to work she would."); and Dr. Craig Morgan, M.D., an ophthalmologist, STD AR 299 ("[Plaintiff] is disabled and is not able to work.  From an eye standpoint, she had a history of optic neuritis and also had Bell's palsy, both of which were caused by her Lyme's [sic] disease. Her last visual field test was performed on 12/9/08 and was normal at that time.").   On

11

November 19, 2010, Plaintiff contacted CIGNA and asked that it wait to review her second appeal until it received medical records from psychologist Linda Geronilla, Ph.D.  STD AR 53.

CIGNA notified Plaintiff on November 30, 2010, that it required additional time to review her second appeal.  It indicated that the "review is needed in order to determine your functional ability, and whether you satisfy the definition of disability as defined under your policy."  STD AR 160.  Meanwhile, CIGNA referred Plaintiff's second appeal review to Nurse Case Manager Maureen Clarke.  STD AR 44.  Nurse Clarke performed a review on December 15, 2010.  She concluded that there "is insufficient clinical information currently on file to support [functional] impairment."  STD AR 44.  In support, she stated that there was no cognitive testing provided to support complaints of cognitive deficits; claimant's obstructive sleep apnea appeared to be under control with CPAP treatment, according to recent sleep studies; cardiac stress tests revealed excellent exercise tolerance; and an MRI of the head was within normal limits.  STD AR 44.  Physical exam findings Nurse Clarke reviewed revealed normal movement of extremities, no deformities or swelling, and normal strength and sensation.  STD AR 44.

On December 16, 2010, CIGNA affirmed its denial of STD benefits a second time.  STD AR 179-80.  The letter stated:

> The clinical information indicated you were diagnosed with Lyme disease in 2001; however you stopped working on 7/17/10. . . .
>
> You had complaints of cognitive deficits, muscle weakness, and fatigue.  There was no cognitive testing and no informal or formal assessment of neurocognitive function documented.  The office notes also did not demonstrate measurable loss of strength.
>
> The clinical notes indicated you had depression; however there was no documentation or referral to behavioral health specialist until 11/3/10 visit with Dr. Geronilla, Ph.D. . . .

> Following the review of your file, the information provided does not support severity of condition[s] to support functional impairment beginning 7/17/10. It was interpreted that the exam findings and test results did not demonstrate a physical impairment to support restrictions and limitations.

STD AR 180.   CIGNA informed Plaintiff that she had exhausted the administrative appeal process and she had a right to bring an ERISA legal action.  STD AR 180.

### C.      Long-Term Disability Claim

As a CRNA at Cabell Huntington Hospital, Plaintiff was covered under an employee benefit plan providing long-term disability benefits ("LTD Plan").  The LTD Plan was issued by Defendant United of Omaha Life Insurance Company ("United"), which also serves as the Plan's claims administrator.

On November 6, 2010, Plaintiff completed a long-term disability claim statement.  LTD AR 728-29.  Plaintiff identified her symptoms as Bell's palsy (left sided) and left chest pain. LTD AR 728.  She stated that she first noticed these symptoms at 38 years old and 32 years old, respectively.  At the time she submitted the claim, Plaintiff was approximately 52 years old.  In response to the question "Why are you unable to work?" Plaintiff wrote "nerve disruption, weak muscle (left leg, right knee, etc.), migraines, fatigue, difficulty swallowing (painful choking), forgetful, poor fine motor skills."  LTD AR 728.  Plaintiff identified her treating physicians and their specialties as Dr. Craig Morgan, specialty: retinol disorder; Dr. Steve Zekan, specialty: none; Dr. David Patick, specialty: internal medicine; and Dr. Jeffrey Darnell, specialty: infectious disease.  LTD AR 729.  She reported that the last day worked before her disability was July 16, 2010.  LTD AR 728.

In support of her claim, Plaintiff submitted a physician's statement from Dr. Patick.  LTD AR 715-16.  Dr. Patick identified Plaintiff's primary diagnoses as Tertiary Lyme Disease, osteoporosis, fracture of the $L_1$ vertebrae, intermittent visual and hearing impairment, right knee

instability, depression, muscle weakness and twitching, severe sleep apnea, restless leg syndrome, and migraine headaches. LTD AR 715. Dr. Patick noted that the symptoms included "extreme fatigue, joint pain, chest pain, cognitive dysfunction, choking, IBS (Irritable Bowel Syndrome), left leg pain, right wrist dysfunction." LTD AR 715. Dr. Patick stated that diagnostic tests had been performed, including MRIs, blood work, Lyme tests (Western Blot), cardiac stress tests, and EKGs. LTD AR 715. Plaintiff reported suffering a deer tick bite in her early thirties, with the neurological symptoms first appearing in her early forties. LTD AR 715. The form also required Dr. Patick to discuss his opinions regarding restrictions and limitations to Plaintiff's work activities. Dr. Patick made clear his opinion that Plaintiff may never return to a prior level of functioning, stating, "recovery doubtful—goal is improved quality of life." LTD AR 716. Dr. Patick further explained, "tertiary Lyme has gradual loss of function," and that it is a chronic illness that affects quality of life. LTD AR 716. As for work limitations, Dr. Patick said that Plaintiff should not lift more than 10 pounds and should not be overly fatigued/stressed. LTD AR 716. Because of Plaintiff's symptoms, Dr. Patick noted that Plaintiff was able to sit up to three hours, stand up to two hours, and walk up to three hours, but there were restrictions on lifting, bending, squatting, and using her hands and feet in repetitive motions. LTD AR 716.

Plaintiff, through her then-attorney, submitted additional medical records in support of her claim on February 10, 2011. LTD AR 474-652. The letter accompanying the medical records summarized Plaintiff's condition and basis for her claim:

> Prior to suffering the devastating impact of Lyme's disease Ms. Childers was an exemplary CRNA. But, as a result of the disease she has experienced numbness and loss of control of her left knee; constant muscle weakness impacting her arms and legs; intermittent hand swelling; chronic fatigue; dizziness; headaches; anxiety; depression; and visual impairment. Perhaps even more devastating is the cognitive dysfunction from which she suffers. She is no longer able to neither [sic] think clearly nor focus on the task at hand. Simply stated, she cannot sustain any level of work, even that of a sedentary job. Today, Cindy Childers is

14

> extremely depressed, not only because of the medical conditions resulting from Lyme disease, but also because of the severe limitations and loss of independence that she must live with every day.

LTD AR 474.  The voluminous medical records included physicians' notes, results of physical examinations, and blood test reports from 2001 to the date of her claim in 2010.

To evaluate Plaintiff's claim and the supporting medical documentation, United retained the services of Dr. Kent Crossley, M.D.  Dr. Crossley is board-certified in internal medicine and infectious diseases, and works as a medical consultant for Professional Disability Associates. LTD AR 450.  United provided Dr. Crossley with eight referral questions to answer in his review.  LTD AR 443-44.  These questions included, "Is the diagnosis of Lyme disease supported by the medical evidence?" "Does it appear the patient is impaired due to Lyme disease?" "What medical conditions are supported by this information?" and "Are the restrictions and limitations provided by the attending physician supported?"  After reviewing the record, Dr. Crossley concluded in his March 31, 2011 report:

> This 52-year old nurse anesthetist has a long history of complaints of vague and poorly documented neurological symptoms and muscular pain.  Physical examinations recorded by Dr. Zekan and Dr. Patick are very sparse and do not, in fact, substantiate any physical findings that would be consistent with the insured's complaints.
>
> While the claimant may have evidence of having had Lyme disease in the past (manifest by occasionally positive IgG Western Blots for *Borrelia burgdorferi*), there is no evidence that she has ongoing Lyme disease.  A large number of studies indicate that a maximum of 28 days of therapy with IV Rocephin is appropriate for treatment of this condition.  Ms. Childers has received at least one year of therapy with Rocephin and has also been treated with a variety of oral antibiotics.  There is no reason to believe that any of her symptomatology is related to Lyme disease.  There is certainly not the slightest suggestion that since 2002 (when she would have finished a year of therapy with Rocephin) any of her symptoms are related to this disease.
>
> The claimant does have documented hyperlipidemia and hypertension.  We have no explanation for any of her other symptoms. . . .

15

> I see no clear organic etiology for any of her symptoms. She has apparently never been assessed by anyone other than Dr. Zekan or Dr. Patick and their records do not support an organic basis for her symptoms. The recent psychological assessment suggests that her health/cognitive issues may have a possible origin in mental health issues.

LTD AR 448.

United also referred Plaintiff's file to one of its nurse case managers, Denise Theisen, RN BSN. Nurse Theisen reached the same conclusion as Dr. Crossley, that Plaintiff's restrictions and limitations were not supported by the medical evidence. LTD AR 740. Nurse Theisen's review additionally focused on Plaintiff's mental health records. In her report of March 11, 2011, she observed,

> Only Psychologist note in file is dated 11/03/10 and indicates that claimant has depression, anxiety and inattentive ADD. Psychologist notes a GAF of 30 but makes no indication for further aggressive treatment including hospitalization or medication changes. File notes that claimant is on Zoloft (depression med) and Xanax (anti-anxiety med) but no evidence of medication for ADD. File does not contain neuropsychological or memory testing to confirm deficits in this regard.

LTD AR 739.

On April 28, 2011, United sent Plaintiff a letter denying her claim for long-term disability benefits. LTD AR 414-26. The denial letter explained the relevant policy provisions, reviewed the duties and responsibilities of a CRNA, and identified the records upon which United relied in making its decision. The letter also provided a thorough summary of those medical records and described the results of the medical reviews performed by Nurse Theisen and Dr. Crossley. After considering all these materials, United concluded:

> Based on medical documentation, there is a lack of medical evidence to support an exacerbation of chronic medical conditions or a change in your medical status. Further we found no physical exam that evidenced restrictions or limitations to preclude frequent lifting up to 10 lbs., occasional lifting up to 20 lbs., or standing/walking six hours out of an eight hour day per the Department of Labor guidelines from October 2008 to July 17, 2010, or beyond.

16

> Further, the medical documentation does not confirm evidence of Lyme's Disease or recurrent Lyme's Disease or evidence of any cardiac or neurological involvement.  Again, as stated above, usual treatment for Lyme's Disease of four weeks of antibiotic therapy, versus your history of 10 years of antibiotics.
>
> Finally, we did not receive any office visits or treatment notes beyond August 2010 to show active ongoing evaluation and treatment.

LTD AR 424.  The letter also informed Plaintiff of her right to appeal United's decision and instructed her how to do so.

Plaintiff appealed the denial of benefits.  In support of her appeal, Plaintiff submitted additional medical records and other documents.  These additional documents included: (1) the report and test results from a May 6, 2011 psychological examination by Charley W. Bowen M.A.; (2) the report and test results from a May 26, 2011 neuropsychological examination by Paul Mulder, Ph.D.; (3) a May 28, 2011 report from D. Joe Woolwine, M.S., C.R.C., an occupational disability consultant; (4) letters from Plaintiff's co-workers attesting to Plaintiff's inability to work; (5) the decision from the Social Security Administration awarding disability benefits; (6) medical records from August 29, 2000 through November 17, 2010, from Plaintiff's consultations with Dr. Imran Khawaja, M.D., a sleep specialist; (7) a November 3, 2010 report from psychologist Linda Geronilla, Ph.D.; (8) a November 4, 2011 report from Dr. Steven Zekan, M.D., F.A.C.S. outlining Plaintiff's history and containing the results of a physical examination; and (9) an October 26, 2011 long-term disability claim physician statement form from Dr. David Patick, M.D.  When preparing the additional documentation, Plaintiff requested that United grant a 60-day extension to provide the records and respond to the independent consultants' reports.  LTD AR 274-75.  United denied the request for sixty additional days, but did allow Plaintiff a 20-day extension.  LTD AR 260-61.  All the records identified above were provided within this time period.

United referred Plaintiff's medical records to two independent physicians to evaluate Plaintiff's claims on appeal—one infectious disease specialist and one neuropsychologist.  LTD AR 172.  Neither physician personally examined Plaintiff; their reports were based solely on their review of the medical records.  Dr. Daniel McQuillen, M.D., who is board-certified in internal medicine and infectious disease, performed the review of Plaintiff's infectious disease diagnoses. LTD AR 787-94.  Dr. McQuillen concluded that "[t]he records support physical diagnoses of hypertension, hyperlipidemia, and obstructive sleep apnea.  The records do not support a diagnosis of Lyme disease."  LTD AR 792.  In Dr. McQuillen's opinion, "[t]he records assert multiple subjective complaints of fatigue, numbness, weakness, and cognitive dysfunction. There are very few complete physical examinations to be found in the records: those that are found during the period in question . . . are normal."  LTD AR 792.  Dr. McQuillen explained that the blood testing performed in the labs were negative for Lyme disease (according to CDC standards) and that treatment with "multiple different antibiotics has essentially made no difference in the claimant's symptoms."  LTD AR 793.  Dr. McQuillen amended his report after receiving Plaintiff's later submissions from the Social Security Administration and the occupational consultant.  LTD AR 826-29.  The new information did not alter his earlier conclusion because the "new information does not provide any new medical record information and thus does not support a diagnosis of Lyme disease."  LTD AR 828.

The independent review of Plaintiff's psychological assessments was performed by Dr. Jacquelyn Olander, Ph.D., a psychologist.  LTD AR 801-14.  United requested Dr. Olander to review the medical records and answer ten questions, including "What psychiatric/psychological conditions are supported by this information?" "What restrictions and limitations are supported by the records, examinations, and diagnostic tests as of 7/16/10 and currently?" and "Are the

18

restrictions and limitations provided by the attending physician supported?"  In her report, Dr. Olander reviewed Plaintiff's psychological evaluations and tests.   Her review of Plaintiff's "records including test results identified a number of significant issues that raises questions regarding the validity of findings and subsequent conclusions."  LTD AR 811.  Specifically, Dr. Olander expressed concern that certain standard practices of test administration were not fully observed.  She stated that "[n]o measure of effort or validity was administered to [Plaintiff] on either evaluation," although it is standard to include such measures particularly when a "substantial gain is present."  LTD AR 811.  Additionally, a "consistency analysis" was not conducted, to analyze whether the test score profile is consistent with established patterns for known disorders, the severity of injury, and other aspects of an individual's behavior.  LTD AR 811.  These deficiencies raised doubt in Dr. Olander's mind about the validity of the cognitive test results.  Dr. Olander concluded that given Plaintiff's IQ scores and MRI result, Plaintiff's "pattern of scores does not appear consistent with Lyme disease."  LTD AR 812.  Regarding Plaintiff's ability to work, Dr. Olander stated:

> Although Ms. Childers has been diagnosed with major depression and anxiety, she reported a history of depression and anxiety dating back to the early 1990's without loss of her ability to work.  Thus, it is my opinion from a psychological and neuropsychological perspective that the information provided in Ms. Childers' records do not provide sufficient documentation to support her claims of significant cognitive changes and dysfunction.  It is also my opinion from a psychological and neuropsychological perspective that Ms. Childers is able to work full time and [sic] her previous or similar occupation.

LTD AR 812.  In an addendum to her initial report, Dr. Olander stated that the additional information provided by Plaintiff, *i.e.,* the Social Security Administration decision, did not impact her prior findings and conclusions "because the only new information consists of opinions and not new data and/or facts."  LTD AR 823.  She did, however, note that the reviewer

of Plaintiff's social security claim relied (inappropriately, in Dr. Olander's opinion) on Wikipedia in granting Plaintiff's disability claim.  LTD AR 824.

On November 14, 2011, United issued its decision upholding the denial of Plaintiff's claim on appeal.  LTD AR 169-74.  Much like it did in the initial decision letter, United identified the medical records it reviewed in making its decision and explained the conclusions reached by the independent physician consultants.  United concluded,

> While we appreciate [Plaintiff's] treating providers' opinions that she is unable to work, this is not supported by the medical records in the file.  Her physical examinations and diagnostic test results, including lab, MRI, x-rays, and stress testing, did not reveal any abnormalities that would support any functional or psychiatric impairments.

LTD AR 173.  United upheld the denial of long-term disability benefits because "the medical evidence in file does not support any impairments that would preclude [Plaintiff] from performing her regular occupation and does not support a disability."  LTD AR 173.

Plaintiff filed suit on January 17, 2012, claiming that Defendants wrongfully denied her both short-term and long-term disability benefits.

## II.    ANALYSIS

### A.    Standards of Review

#### 1.    Summary judgment standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying

facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## 2.    ERISA standard

Under the Employee Retirement Income Security Act ("ERISA"), courts must conduct a *de novo* review of an administrator's decision to deny benefits, unless the plan confers discretionary authority upon the administrator "to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When discretion is vested with an administrator, courts must review the decision for an abuse of discretion. *Id*; *Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 315 (4th Cir. 2001) (citation omitted).  In applying the abuse of discretion standard, an administrator's decision "will not be disturbed if it is reasonable, even if . . . [the] court would have come to a different conclusion independently." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (citations omitted) *abrogated on other grounds*, *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 631 (4th Cir. 2010).  If the decision is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence[,]" the decision must be affirmed, and the reviewing court

cannot substitute its own judgment for that of the administrator.  *Elliot v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999) (internal quotation marks omitted).  It is the claimant's burden to demonstrate entitlement to benefits.  *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270 (4th Cir. 2002).

### B.      Cross-Motions for Summary Judgment on Plaintiff's Short-Term Disability Claim

CHH and Plaintiff each move for summary judgment on Plaintiff's claim for short-term disability benefits.  The Court must first determine the applicable standard of review and then evaluate the merits of Plaintiff's claim.

### 1.      *De novo* review applies

Plaintiff argues that the terms of the Short-Term Disability Plan and the Administrative Services agreement between CHH and Life Insurance Company of North America (a CIGNA company) delegate no discretion to CIGNA for the award of benefits.[3]  Plaintiff claims that accordingly, CIGNA had no authority to make the decision to deny Plaintiff STD benefits and its denial is void.  Plaintiff thus urges the Court to apply a *de novo* standard of review to Plaintiff's claim for STD benefits.

---

[3] Plaintiff argues that because CHH failed to include the STD Plan or the Summary Plan Description ("SPD") in the Administrative Record, it is improper for the Court to consider it. The STD Plan and the SPD did not appear in the administrative record, but they were attached to CHH's motion for summary judgment.  In her response brief, Plaintiff referred to a contemporaneously filed motion to strike the STD Plan from the record, although no such motion was made.  In any event, the Court sees no reason to strike the plan. *See Majeski v. Metropolitan Life Ins. Co.*, No. 07C3206, 2009 WL 900983, at *11 n.7 (N.D. Ill. Mar. 31, 2009) (court refused to apply *de novo* review merely because defendant submitted the disability plan with its summary judgment pleadings rather than include it in the administrative record), *vacated and remanded on other grounds*, 590 F.3d 478 (7th Cir. 2009).  Moreover, Plaintiff referred to both the STD Plan and the SPD in her pleadings, yet asks only for the STD Plan to be stricken. Plaintiff has not demonstrated any prejudice resulting from the late filing of the STD Plan and the Court will not strike it from the record.

The language of the plan documents in this case is anything but clear. The Summary Plan Description ("SPD"), the STD Plan itself, and the Administrative Services Agreement ("ASA") do not explicitly name a Plan Administrator. The SPD, for example, is internally inconsistent on this issue. Section 10.5 of that document defines the "Claim Administrator" as "the person or entity chosen by the Plan to review claims for benefits provided under the Plan, as provided for by ERISA." SPD § 10.5, CHH Mot. Summ. J. Ex. B, ECF No. 49-2. It includes a separate definition of "Plan Administrator," which is "the person or entity chosen by the Plan to act as the administrator of the Plan, as provided for by ERISA." SPD § 10.14. Several sections later, it instructs claimants to submit claim forms "to the Claim Administrator appointed by the Plan Administrator," but in the next sentence somewhat contradicts an earlier definition and states that "[t]he Plan Administrator is the named fiduciary for adjudicating claims for benefits under the Plan, and for deciding any appeals of denied claims." SPD § 12.2. Furthermore, the ASA between CIGNA and CHH bears the disclaimer that:

> Nothing herein contained shall be construed as making Administrator [CIGNA] or any of its officers or employees a fiduciary with respect to the Plan, and Employer assumes responsibility for all liability resulting from breach of fiduciary duty under ERISA. Administrator is not the Plan Administrator as that term is used within ERISA, nor is Administrator authorized to accept service of process on behalf of the Plan.

STD AR 5. It is easy for the Court to understand Plaintiff's confusion as to which entity is a Plan Administrator, which is a Claims Administrator, and whether there was a proper delegation of authority to make claims determinations in this case.

Guided by the principle that any ambiguity in the Plan is to be construed against the drafter, *Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 269 (4th Cir. 2002), the Court finds that: (1) the Plan confers discretionary authority on the Plan Administrator; (2) the Plan Administrator in this case is Cabell Huntington Hospital; (3) the Plan permits the Plan

23

Administrator to delegate certain fiduciary duties under the plan; and (4) the Plan Administrator delegated to CIGNA its authority to adjudicate claims for benefits.  The Plan Administrator failed, however, to delegate its *discretion* to CIGNA.

First, the Court turns to the language of the STD Plan and the SPD to look for language conferring discretion.  Section 12.2 of the SPD contains such language:

> The Plan Administrator shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.  All decisions made by the Plan Administrator shall be final and binding on Participants and Beneficiaries to the Full extent permitted by law.

SPD § 12.2.  This provision sufficiently satisfies the requirements of *Firestone*.  This clear language, however, does not appear in the STD Plan itself.  Instead, the STD Plan states:  "[T]he Plan Administrator's powers will include . . . (b) To interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons claiming benefits under the Plan."  STD Plan § 14.2.  While this phrasing does not confer discretionary authority as explicitly as that found in the SPD, this language still gives plan participants notice that the Plan Administrator has the power to interpret the STD Plan, which interpretation will be *final* and *conclusive* on plan participants.  Moreover, there is no conflict between the language of the SPD and the STD Plan—they are merely different restatements of the same concept.  This grant of final interpreting power is a sufficient grant of discretion to trigger the deferential standard of review. *See Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 523 (4th Cir. 2000) ("[I]f the terms of a plan indicate a clear intention to delegate final authority to determine eligibility to the plan administrator, then this Court will recognize discretionary authority by implication."); *see also Shields v. Continental Cas. Co.*, 209 F. Supp. 2d 1167, 1174 (D. Kan. 2002) (applying abuse of

discretion standard to identical plan language); *Cliff v. IMC Holdings, Inc.*, No. 98C4969, 1999 WL 495630, at *4 (N.D. Ill. June 28, 1999) (same).

Second, despite CHH's assertions to the contrary, CHH is the Plan Administrator under the terms of the STD Plan, as that term is used in ERISA. The ASA demonstrates the parties' intent that CIGNA shall not be the Plan Administrator as that term is defined by ERISA. The Plan does not identify the Plan Administrator by name. Where the Plan Administrator is not specifically identified, ERISA supplies this information. Pursuant to 29 U.S.C. § 1002(16)(A), the "administrator" is:

> (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
> (ii) if an administrator is not so designated, the plan sponsor; or
> (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

In this case, CHH is the plan sponsor and thus the Plan Administrator by default. 29 U.S.C. § 1002(16)(B). It was CIGNA, however, who denied Plaintiff's claim. ERISA permits a benefits plan to allow "for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." 28 U.S.C. § 1105(c)(1). Where a named fiduciary of a plan, vested with discretionary authority, properly delegates its fiduciary responsibilities, then discretionary review "applies to the designated ERISA-fiduciary as well as to the named fiduciary." *Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1284 (9th Cir. 1990), *cert. denied*, 498 U.S. 1087 (1991); *see also Lee v. MBNA Long Term Disability & Benefit Plan*, 136 Fed. App'x 734, 742 (6th Cir. 2005). Therefore, if CHH, as the Plan Administrator and plan fiduciary, properly delegated its fiduciary duties—and its discretion—to CIGNA, then the Court will apply an abuse

of discretion standard of review to CIGNA's denial of Plaintiff's claim, provided CIGNA's denial of the claim was an act of discretion.

The Court finds that the STD Plan permits the Plan Administrator to delegate certain fiduciary responsibilities.  STD Plan § 14.2(f) (granting Plan administrator power "[t]o allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing").  Such a written delegation appears in the ASA, in which CHH retained CIGNA to provide claim administration services.  Under the terms of the ASA:

> [CIGNA] will provide the initial and ongoing screening of claims to determine whether benefits are payable in accordance with the terms of the Plan. . . . [CIGNA] will seek and obtain information from medical providers and others necessary to determine qualification for benefits and amount thereof. . . . [CIGNA] will calculate benefits in accordance with the terms of the Plan and will prepare and deliver benefit checks.  [CIGNA] will communicate benefit decisions to claimants and, if payable, will furnish claimants with an explanation of how benefits were calculated.

> In determining any person's right to benefits under the Plan, Administrator shall rely upon eligibility information furnished by the Employer.

STD AR 7.  This language vests in CIGNA authority to determine claims, but it does not grant *discretionary* authority.  In *Woods v. Prudential Insurance Company of America*, 528 F.3d 320 (4th Cir. 2008), the Fourth Circuit held that "discretionary authority is not conferred 'by the mere fact that a plan requires a determination of eligibility or entitlement by the administrator.'" *Woods*, 528 F.3d at 322-23 (quoting *Gallagher*, 305 F.3d at 269).  The language here is similar to the benefits plan at issue in *Woods*, where the Fourth Circuit concluded that plan provisions did not confer discretionary authority by stating that disabilities are "determined by Prudential" and that a claimant is eligible for benefits "when Prudential determines" that eligibility exists. *Id.* at 323-24.

Finally, the ASA includes a provision regarding the "Handling of Inquiries, Complaints and Appeals" that dispels any notion that CIGNA retains discretion under the Agreement. The provision states in relevant part:

> [CIGNA] shall generally coordinate the claim denial and appeal process provided for in ERISA regulations. This shall include notifying claimants of their appeal rights, receiving appeals, making a *recommendation* to [CHH] concerning the disposition of appeals, and communicating *[CHH's] decision* to the claimant. It is understood that [CHH] shall be the fiduciary designated under ERISA regulations for the determination of appealed claims and that in this process *[CIGNA] shall serve solely as [CHH's] agent to coordinate and facilitate the appeal process.*

STD AR 10 (emphasis added). This language compels the Court to conclude that by the terms of the ASA, CHH did not grant CIGNA discretionary authority in the claims administration process. Accordingly, the Court will conduct a *de novo* review of Plaintiff's claim for STD benefits. The standard of review is not dispositive, however, in this case; the Court would reach the same conclusion if it reviewed Plaintiff's claim for abuse of discretion.

### 2. Plaintiff's claim for STD benefits

The Court's analysis requires a review of the language of the Plan. In this case, the STD Plan:

> Will pay Disability Benefits if an Employee becomes Disabled while covered under this Plan. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Plan. He or she must provide the Plan, at his or her own expense, satisfactory proof of Disability before benefits will be paid. The Disability Benefit is shown in the Schedule of Benefits.

STD Plan § 6.2, ECF No. 49-1. The Plan defines "Disability/Disabled" as follows:

> The Employee is considered Disabled if, solely because of a covered Injury or Sickness, he or she is:

> 1.     unable to perform all the material duties of his or her Regular Occupation, and

27

2.      unable to earn 80% or more of his or her Covered Earnings from working
in his or her Regular Occupation.

The Plan will require proof of earnings and continued Disability.

STD Plan Schedule of Benefits for Class 1, § 1.3.  Sickness is defined simply as "[a]ny physical

or mental illness or disease."  STD Plan § 12.17.  Finally, "Appropriate Care"

means the determination of an accurate and medically supported diagnosis of the
Employee's Disability by a Physician, or a plan established by a Physician of
ongoing medical treatment and care of the Disability that conforms to generally
accepted medical standards, including frequency of treatment and care.

STD Plan § 12.4.

The STD Plan requires claimants to provide written proof of loss.  STD Plan § 10.5.  The

Plan does not, however, define what constitutes "proof of loss."  Under the terms of the STD

Plan, an employee's ability to work is based in part on "medical evidence submitted by the

Employee" and "consultation with the Employee's Physician."  STD Plan § 1.4.  In its denial

letters and the briefs filed in this case, CHH stated that Plaintiff's claim was denied because she

failed to produce objective medical findings to support her subjective complaints of symptoms

and the records failed to document any functional impairment.  *See, e.g.,* STD AR 138.  Plaintiff

argues that the STD Plan does not explicitly require *objective* medical proof, *e.g.*, test results and

laboratory reports.  Plaintiff claims she satisfied the Plan's requirements by producing sufficient

evidence of clinical examinations and the opinions of her treating physicians and employer.  The

Court agrees with CHH that Plaintiff's subjective complaints alone would be insufficient to

establish a disability.  However, Plaintiff is correct that the STD Plan does not condition the

award of benefits on objective medical proof—rather, only "medical evidence" is required.

In this case, Plaintiff submitted appointment notes, blood test results, and clinical reports

from her treating physicians dating back approximately ten years.  These records document

28

Plaintiff's extensive history of various physical and neurological symptoms, which prompted at least one doctor to diagnose Lyme disease.  The Lyme disease diagnosis was supported by the 2001 Lyme IgG Western Blot test, which returned positive according to IGeneX criteria, but negative by criteria promulgated by the CDC.[4]   STD AR 422.   Unlike the LTD Plan Administrator United of Omaha, CIGNA and CHH did not question the initial diagnosis of Lyme disease when evaluating the STD claim.  STD AR 138 ("It was noted . . . that you have been having reoccurrence of the Lyme disease, however the most recent diagnostic test was from the year of 2000."); 166 ("Your records indicated you were diagnosed with [L]yme disease in 2001. It was unclear what had changed in your condition at the time you went out of work."); 180 ("You had a mediport insertion performed on 8/24/10 for treatment of your Lymes [sic] disease.").   Plaintiff was first diagnosed with Lyme disease in 2001 and began receiving treatment for the diagnosis at that time.  Plaintiff was still following up with her physicians regarding her symptoms at the time she began her employment at CHH.  It was eminently reasonable then for CIGNA to ask what had changed in Plaintiff's condition that disabled her from performing her job functions; making such an inquiry is what a responsible fiduciary is expected to do.  The Court now does the same.

The primary evidence Plaintiff produced to support her claim that she was unable to perform the material duties of her occupation was the opinions of her doctors that her condition was deteriorating.   Rather than identify specific restrictions on Plaintiff's activities, her physicians generally stated that she was unable to work.  STD AR 467 (Dr. Patick stating "unable to work as of July 17, 2010"); 229 (Dr. Zekan stating "unable to work till symptom[s]

---

[4] According to the CDC, an IgG Western Blot test is positive for Lyme disease if five of ten "bands" are present.  Criteria promulgated by IGeneX, the company that administers the test, indicate that the test is considered positive if two of six specified bands are present.  STD AR 422.  Plaintiff's blood test showed the presence of only four of ten required CDC indicators, but three of the six IGeneX indicators.

get better").  In response to a follow-up letter seeking clarification of his opinion, Dr. Zekan stated "Pt at this extreme fatigue + weakness.  Mind is foggy doesn't think clearly, can't stay focused.  Headaches, joint pain."  STD AR 230.  Neither treating physician explained whether his opinion that Plaintiff was unable to work was based on the STD Plan's definition of disability, or how Plaintiff's symptoms prevented her from performing her job functions.  *See Lucy v. Macsteel Serv. Ctr. Short Term Disability*, 107 Fed. App'x 318, 321 (4th Cir. 2004) (citing *Gallagher*, 305 F.3d at 274) ("In *Gallagher,* when we were faced with similar conclusory opinions of disability, we held that they did not create a genuine issue of material fact because the doctors did not indicate whether their opinions were based on the plan's definition of disability.").

As CIGNA's reviewers observed, Plaintiff first reported experiencing her symptoms in 2001.  Between 2001 and the date of her claim in 2010, Plaintiff visited her primary care physician for both routine and follow-up appointments regarding her medical complaints. During that time, Plaintiff reported an array of symptoms and was placed on various medication regimens.  These symptoms were similar to those she reported in making her STD claim.  Before 2010, however, Plaintiff stated that she was able to perform her job functions despite suffering these symptoms.  In March 2007, Plaintiff followed up with Dr. Patick for her symptoms, specifically fatigue and leg weakness.  Dr. Patick noted that "she is still working as a nurse anesthesiologist and things are working out."  STD AR 496.  In an August 2007 visit for her symptoms, specifically aches in her wrists and ankles, she was again "working hard as a nurse anesthesiologist" at that time.  STD AR 494.  In March 2008, Dr. Patick noted his medical impression of Plaintiff as having hypertension, hyperlipidemia, history of Lyme disease, chronic depression, and chronic pain syndrome.  Those symptoms are similar to those of which she

complained in her disability claim.  Yet at that time, as Dr. Patick observed, "she is still busy working as a nurse anesthesiologist."  STD AR 491.  On a March 26, 2009 appointment, Dr. Patick identified Plaintiff's "active problems" as: pure hypercholesterolemia, generalized anxiety disorder, depressive disorder, benign hypertension, esophageal reflux, and osteoarthrosis.  STD AR 487.  Yet, as Dr. Patick noted at that time, "she still works as a work [sic] anesthetist at Cabell and stays busy."  STD AR 487.  Therefore, the evidence of Plaintiff's medical history demonstrates that in the past, she has successfully performed her job functions despite reporting similar symptoms she now claims are disabling.

Plaintiff's objective test results do not provide proof that her condition worsened and prevented her from working.  For example, an MRI performed in October 2010 demonstrated a "normal MRI of the brain with and without contrast," and led to the conclusion that "changes of Lyme disease are not identified within the brain."  STD AR 320.  Plaintiff's most recent eye exam, performed in December 2008, was normal.  STD AR 299.  These test results do not provide evidence that Plaintiff's condition was deteriorating to the point of disability.  While the Court does not decide that objective medical records are absolutely necessary to a successful claim under the STD Plan, it cannot ignore the objective evidence that does exist.

Plaintiff also produced the psychological evaluation report from Dr. Geronilla to support her claim on appeal.  STD AR 269-70.  Unlike Drs. Patick and Zekan, Dr. Geronilla did identify Plaintiff's job responsibilities and opined that Plaintiff was incapable of performing these duties due to her "lack of physical stamina and mental concentration."  STD AR 270.  She diagnosed Plaintiff with depression, generalized anxiety, and inattentive attention deficit disorder.  Dr. Geronilla's report, however, was based on her interview with Plaintiff and her general observations; it does not appear that any neurocognitive tests were performed.  STD AR 269.

Dr. Geronilla also stated that Plaintiff "is in active, ongoing treatment with me for the above stated conditions," though it seems that the first time she met with Plaintiff was in November 2010—months after Plaintiff first claimed disability.  The report did not specify a treatment plan; it merely listed Plaintiff's current medications.  Finally, Dr. Patick had identified some of these same mental diagnoses as early as 2006.  STD AR 498 (progress note from November 17, 2006 appointment indicating "chronic depression"); 494 (progress note from August 1, 2007, indicating "chronic anxiety").  As previously discussed, Plaintiff was successfully working as a CRNA at these times, too, even after Dr. Patick identified possible anxiety and depression disorders.  Dr. Geronilla's report, therefore, does not itself prove Plaintiff's entitlement to STD benefits.

After reviewing Plaintiff's detailed and extensive medical records in this case, the Court concludes that Plaintiff has not satisfied her burden under the STD Plan to prove her entitlement to benefits.  The Court does not believe that Plaintiff is feigning her symptoms or is attempting to defraud the STD Plan.  The medical evidence Plaintiff has presented, however, does not demonstrate that Plaintiff is unable to perform the material duties of her occupation.  Plaintiff has reported similar symptoms in various degrees for over ten years, including while working as a CRNA.  Throughout that time, Plaintiff's treating physicians prescribed her medications to address her symptoms, which allowed her to continue to perform her CRNA duties.  Plaintiff has not demonstrated her entitlement to STD benefits under the Plan.  Consequently, the Court **GRANTS** Defendant CHH's motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment.

**C.**     **Cross-Motions for Summary Judgment on Plaintiff's Long-Term Disability Claim**

Both United and Plaintiff move for summary judgment on Plaintiff's claim for long-term disability benefits.  The Court will first determine the appropriate standard of review to apply and then evaluate the relevant factors.

**1.**     **Abuse of discretion standard applies**

Plaintiff argues strenuously that this Court should apply a *de novo* standard of review to United's decision to deny Plaintiff's claim for long-term disability benefits.  The Court disagrees and concludes that the language of the plan requires application of an abuse of discretion standard.  The LTD Plan in this case contains an "Authority to Interpret Policy" provision which states:

> Policy benefits will be paid only if We determine, in Our discretion, that the claimant is entitled to benefits under the terms of the Policy (see the Authority to Interpret Policy provision in the ERISA Summary Plan Description information included with the Certificate).

LTD AR 29.  The AUTHORITY TO INTERPRET POLICY section of the Summary Plan Description ("SPD") in turn states:

> The Policyholder has delegated to Us the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them.  In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder, an Insured Person or any other third parties.

LTD AR 37.  The plan language makes clear that benefits will be paid *only* if United determines in its *discretion* that claimant is entitled to benefits.  It plainly states that the employer has delegated to United the discretion not only to determine eligibility for benefits but also to

33

construe the terms of the plan, thus requiring an abuse of discretion standard to be applied. *Firestone Tire & Rubber Co.*, 489 U.S. at 115.

Plaintiff argues that the Authority to Interpret Policy section in the summary plan description is "equivocal" as to whether discretion is reserved solely in United. Additionally, Plaintiff argues that the SPD is the language that should be applied, because there is a conflict between the language there and the language in the plan itself. This argument is without merit. First, the Court views no discrepancy between the language of the SPD and that in the body of the plan. Moreover, the language in the main body expressly refers to the SPD. Second, if anything, the SPD contains a more complete statement delegating discretion to United, which parallels the language in *Firestone* that requires an abuse of discretion standard.

Alternatively, Plaintiff argues that if the Court does apply an abuse of discretion standard, there is a conflict of interest because as the insurer, United determines whether to approve claims and is also the party that pays any claims due. Such a conflict should be considered in deciding whether there has been an abuse of discretion. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). When a conflict of interest exists, it "becomes just one of the 'several different, often case-specific, factors' to be weighed together in determining whether the administrator abused its discretion." *Carden v. Aetna Life Ins. Co.,* 559 F.3d 256, 260 (4th Cir. 2009) (quoting *Glenn*, 554 U.S. at 117). How much weight to give the conflict "will . . . depend largely on the plan's language and on consideration of other relevant factors." *Id*. at 261.

In *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), the Fourth Circuit set forth a nonexclusive list of "other relevant factors" courts should consider in determining the reasonableness of an administrator's decision. These include:

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.   201 F.3d at 342-43 (footnote omitted).   The Court applies these factors as guidance in considering the present case but, for the reasons stated above, places no greater emphasis on the conflict of interest factor.

### 2.   Application

The Court now applies the relevant *Booth* factors to the record in this case.   As previously discussed, no one factor is determinative.   Similarly, not all factors are applicable in each case.   Analysis of these factors will guide the Court in its primary inquiry: whether United's decision is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.   The relevant factors disputed in this case are: (a) the language of the plan; (b) the adequacy of the materials considered and degree to which they support United's decision; (c) whether the decisionmaking process was reasoned and principled; and (d) the conflict of interest.   The Court will address each factor in turn.

### a.   Language of the plan

The Court's analysis must begin with the language of the plan itself.   Under the LTD Plan, "Disability" and "Disabled" means:

> That because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

(a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

(b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation. Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

LTD AR 38-39. Sickness means "a disease, disorder or condition . . . for which you are under the care of a Physician. Disability must begin while you are insured under the Policy." LTD AR 41. For purposes of Plaintiff's claim in this case, the Court specifically focuses on the component of the definition that requires "a significant *change*" in claimant's functional capacity. This is especially relevant here, where Plaintiff submitted records documenting over ten years of health complaints and she successfully worked during much of that time.

The plan requires a claimant to submit written proof of loss before a claim can be considered. LTD AR 28. The statement must include, *inter alia*: (1) the date the disability began; (2) the *cause* of the disability; and (3) any restrictions and limitations preventing claimant from performing her regular occupation. LTD AR 28 (emphasis added). A claimant must also submit a statement from her employer and physician. Benefits are paid after United of Omaha receives "acceptable proof of loss." LTD AR 28. Plaintiff argues that United acted unreasonably by demanding objective medical evidence of her disability, because objective evidence is not required under the language of the plan. United in turn does not disagree that the plan does not explicitly require objective evidence, but contends that objective medical evidence must be considered when evaluating proof of loss.

The Court concludes that under the terms of the plan, it is not an abuse of discretion for United to interpret the language to require objective medical evidence when determining whether

a claimant has sufficiently proven her disability under this plan. It has been observed that "[w]ere an opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." *Coffman v. Metropolitan Life Ins. Co.*, 217 F. Supp. 2d 715, 732 (S.D. W. Va. 2002). Indeed, when viewing other language in the plan, it becomes evident that for unrestricted LTD benefits to be granted, some objective evidence of disability is required. The plan contains a provision limiting benefits for self-reported symptoms. That provision states:

> If Your Disability is primarily based on Self-Reported Symptoms, Your benefits will be limited to 24 months while You are insured under the Policy . . . .

> Self-Reported Symptoms means the manifestations of Your condition which You tell Your Physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of Self-Reported Symptoms include . . . headaches, pain fatigue, stiffness, soreness, ringing in ears, dizziness, numbness, and loss of energy.

LTD AR 27. Therefore, a holistic reading of the plan language indicates that a claimant is required to support her disability claim with some objective evidence. Otherwise, the self-reported symptoms limitation would be superfluous.

Plaintiff argues in the alternative that even if Plaintiff's symptoms are not attributable to Lyme disease, it is an abuse of discretion for United to deny LTD benefits in the event that Plaintiff is suffering from an undiagnosed condition. That is, Plaintiff claims that United's interpretation of the "proof of cause" of a claimant's disability is too demanding. In support, Plaintiff cites an unreported case from the District of Minnesota, *Huberty v. Standard Insurance Company*, No. 06-CV-2388 (PJS/RLE), 2008 WL 783407 (D. Minn. 2008). The court in *Huberty* found that the claimant was entitled to disability benefits for "neuropathic pain" he suffered. The plan administrator in that case argued that the claimant was required to provide

evidence of the source of his pain.  The court rejected this argument, reasoning that based on that interpretation of the policy, "a person suffering from a baffling disease would have no disability coverage, even if objective evidence showed beyond doubt that he was disabled by the disease." *Id.* at *31.   The court additionally held that even if the claimant's pain was partly psychogenic, he would still be able to recover benefits, subject to a mental illness policy limitation similar to the one contained in United's plan here.  *Id.* at *32.  The court found that the claimant was under the care of physicians who diagnosed him as suffering a disease, and the court believed that any mistake or good faith disagreement by the physicians in their diagnosis are not reasons to cut off benefits under the administrator's policy "to an insured who is actually disabled." *Id*.  The court reasoned that the purposes of the insurance policy are still served "if a claimant who is *in fact* disabled by some medical condition remains eligible for benefits as long as a doctor diagnoses him with a disabling condition, even if that diagnosis later proves to be mistaken." *Id.*  Plaintiff argues that the same reasoning applies in this case.  In other words, Plaintiff should not be denied benefits if her symptoms derive from a misdiagnosed or undiagnosed condition.

In the context of this plan, however, *Huberty* is not persuasive.  First, the plan in this case includes the specific requirement that to meet her burden demonstrating proof of loss, a claimant must show the cause of disability.  The plan at issue in *Huberty* contained a proof of loss provision that was simply defined as "written proof that you are Disabled and entitled to [long-term disability] Benefits."  *Huberty*, 2008 WL 783407, at *2 (quoting the plan).  Second, as fiduciary, United has an obligation to all its participants, and its rigorous proof of loss requirement is a reasonable way to fulfill that obligation.  A recent case in this district similarly interpreted a plan also requiring claimants to show proof of cause of disability.  In that case, the court concluded:

> Compelling Mutual to accept plaintiff's less demanding view of the Plan's proof requirements—while also insisting that Mutual accept her subjective complaints unaccompanied by corroborating objective proof—would undermine Mutual's role as fiduciary and plan administrator. Wholly apart from the Plan's directive according Mutual sole authority over its interpretation, the Plan's plain language and purpose, as well as the understanding of Mutual's role as fiduciary, counsel in favor of defendant's sensible interpretation.  Simply put, Mutual did not abuse its discretion in finding that plaintiff failed under the terms of the Plan to provide sufficient evidence explaining both the cause of her disabling condition and how the condition rendered her unable to perform the material duties of her occupation.

*Bess v. Mut. of Omaha Ins. Co.*, Civ. Action No. 2:11-00143, 2011 WL 5858815, at *8 (S.D. W. Va. Nov. 22, 2011) (footnote omitted).  Accordingly, this Court cannot conclude that United abused its discretion by requiring Plaintiff to prove the cause of her disability, as explicitly required by the terms of the plan.  *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir. 1996) (reversing district court's award of benefits, stating, "[t]he district court found the record to be sufficient to support an award of disability benefits based on the fact that no doctor doubted the veracity of plaintiff's subjective complaints of fatigue and joint pain. . . . [But] [i]n the absence of any definite anatomic explanation of plaintiff's symptoms, we cannot find that the administrator's decision to deny benefits was arbitrary and capricious.").

Plaintiff argues in the alternative that even if United determined that Plaintiff did not support her claim with sufficient objective medical evidence for full LTD benefits, she should have been awarded LTD benefits subject to the self-reported symptoms limitation or mental/nervous disorder limitation.[5]  The language of these provisions, however, does not require the administrator to grant LTD benefits in response to a claimant's mere assertion of a disabling symptom.  Such a loose interpretation would allow claimants too easily to skirt the

---

[5] The mental disorder limitation is nearly identical to the self-reported symptoms limitation.  It reads: "If You are Disabled because of a Mental Disorder, Your benefits will be limited to a total of 24 months while insured under the policy . . . ."  LTD AR 6.

plan's stringent proof of loss requirements and make the plan susceptible to abuse.  The self-reported symptoms limitation applies where the *disability* is based, or diagnosed, by self-reported symptoms.  That is, the self-reported symptoms must be connected to a disabling condition in order for the limited LTD benefits to be granted.  A claimant is not automatically entitled to benefits merely for self-reporting symptoms like headaches, fatigue, or numbness; those symptoms must have been connected to the diagnosis of a disabling condition.  For example, certain conditions are recognized by the medical community, but not amenable to diagnosis by objective medical tests.  Diagnosing physicians must instead rely on a patient's self-reported description of symptoms in making that diagnosis.  Such a claimant would therefore fit under United's plan—they could demonstrate the cause of their disability and may be awarded benefits based on that condition, but the self-reported symptoms limitation may apply to limit those benefits.

Moreover, the plan requires that the condition be disabling.  Here, there is no consensus that Plaintiff suffers from a specific diagnosed condition that causes her to be disabled.  Therefore, United's failure to award Plaintiff limited benefits based on either of these two limitations was not an abuse of discretion, given the language of the plan and its conclusion that Plaintiff did not provide sufficient proof of loss.  United's interpretation of the plan language was reasonable.

**b.    Adequacy of materials considered and degree to which they support decision—substantial evidence**

Next, the Court turns to an important factor in its analysis: the adequacy of the materials considered and the degree to which they support the decision, *i.e.,* whether United's decision is supported by substantial evidence.  As an initial matter, the Court finds that the materials considered by United in reaching its decision were more than adequate.  Plaintiff provided—and

United considered—medical records spanning more than ten years, physicians' statements, and the opinions of independent reviewers.  United had a full record before it when it evaluated Plaintiff's claim for LTD benefits.  Furthermore, on appeal of the initial decision, United accepted additional records and letters of support from Plaintiff.  Those supplemental records, which contained objective medical evidence, were taken into account when United upheld the denial of Plaintiff's claim on appeal.  The record, therefore, was fully developed and adequate.

Plaintiff alleges that United's decision to deny her LTD benefits was not supported by substantial evidence.  She argues that the record contains ample evidence, including opinions from her treating physicians and former colleagues, that Plaintiff is disabled and can no longer perform her job functions.  As previously discussed, the LTD plan requires Plaintiff to prove the cause of any alleged disability.  Dr. Patick identified several such causes in the record, listing Plaintiff's primary diagnoses as Tertiary Lyme Disease, osteoporosis, fracture of the $L_1$ vertebrae, intermittent visual and hearing impairment, right knee instability, depression, muscle weakness and twitching, severe sleep apnea, restless leg syndrome, and migraine headaches. LTD AR 715.  Through the initial claim process, Plaintiff characterized Lyme disease as her primary complaint.  LTD AR 474.  The Court finds, however, that substantial evidence exists to support United's conclusion that Plaintiff is not disabled due to Lyme disease.

First, the record indicates that it was Dr. Zekan who initially diagnosed Plaintiff with Lyme disease.  Plaintiff then reported that diagnosis to the other doctors she consulted.  It does not appear that other doctors confirmed that diagnosis.  Therefore, the fact that the diagnosis appears in so many of her medical records is attributable to her self-reporting, rather than those physicians making or confirming the diagnosis.  Second, the medical test results did not support a diagnosis of Lyme disease.  These objective records may fairly be interpreted as evidence that

Plaintiff does not have Lyme disease, or at best, that she may have had it in the past.  The evidence contradicting a diagnosis of Lyme disease included:

1.     On May 11, 2001, Dr. Patick noted "[Plaintiff's] Lyme titers are negative and her MRI of the head didn't show anything that would point to a demyelinating disease."  LTD AR 591.

2.     A negative August 2001 IgG Western Blot test, according to CDC criteria.[6]  LTD AR 478.

3.     A negative August 2001 IgM Western Blot test.  LTD AR 615.

4.     A negative August 2001 Lyme DOT-BLOT assay.  LTD AR 616.

5.     A December 2008 eye examination that was normal.  LTD AR 487.

6.     A September 2010 IgG Western Blot test that was positive by IGeneX criteria but negative by CDC criteria.  LTD AR 523.

7.     A negative September 2010 IgM Western Blot test.  LTD AR 522.

8.     An October 2010 MRI which revealed a "normal MRI of the brain with and without contrast.  Specifically, changes of Lyme disease are not identified within the brain."  LTD AR 508.

9.     A negative October 2010 IgM Western Blot test.  LTD AR 514.

10.    An October 2010 IgG Western Blot test that returned an "unreadable" result, making "no interpretation possible."  LTD AR 514.

Two of the physicians United hired as independent medical consultants were board-certified in infectious disease.  These physicians (Dr. Crossley and Dr. McQuillen) reviewed the available evidence, including the test results listed above, and determined that they did not support a diagnosis of Lyme disease.  United did not abuse its discretion in crediting their opinions, which

---

[6] *See supra*, note 4.

were supported by substantial medical evidence in the record.[7]  *See Allen v. Life Ins. Co. of North Am.*, No. 10-6549, 2012 WL 5416611, at *4 (6th Cir. 2012) (affirming denial of LTD benefits where physicians offered conflicting opinions of whether claimant suffered from Lyme disease and claimant "consistently failed objective medical laboratory tests" for the disease).

United argues that at most, the nature of Plaintiff's self-reported symptoms and the few favorable medical tests may be read to conclude that Plaintiff *may* have had Lyme disease in the past, but does not currently have the disease.  One of United's independent consultants reached that very conclusion.  LTD AR 448 (Dr. Crossley concluding that Plaintiff "*may* have had Lyme disease a decade or so ago but she was more than adequately treated in 2001 for this disease. . . . [T]here is no evidence at all of an infective etiology for her symptoms since that time.") (emphasis added).  Given the recent objective medical evidence from 2008 and 2010, including the normal MRI, normal eye exam, and blood test results, all of which contradicted a Lyme disease diagnosis, it was not unreasonable for United to conclude that Plaintiff did not suffer a disability as a result of Lyme disease.

Plaintiff next argues that even if United acted reasonably in denying LTD benefits based on a Lyme disease diagnosis, it was not reasonable for it to conclude that she was not disabled from any other condition, either.  In support of this argument, Plaintiff lists all the reported symptoms that her doctors recorded at examinations throughout the years and invites the Court to draw the conclusion that this long list of symptoms must qualify her as disabled.  ECF No. 61 at

---

[7] The Court notes that the original diagnosis of Lyme disease in 2001 was made by a general surgeon, not a physician board-certified in infectious diseases.  Furthermore, Plaintiff's treating infectious disease physician supplied a letter succinctly stating: "The above patient is unable to work due to cognitive dysfunction, which is *presumed* secondary to Lyme Disease."  LTD AR 499 (emphasis added).  It was not abuse of discretion for United to credit its experts, who performed a thorough review of all Plaintiff's provided medical records, over this single conclusory sentence from Plaintiff's treating infectious disease specialist, unsupported by his examination notes or any test results.

8-9.  Many of those reported symptoms, however, are from office visits that preceded Plaintiff's disability claim by many years.  *See* LTD AR 600 (Aug. 1, 2007); LTD AR 361 & 367 (Mar. 2001); LTD AR 604 (Nov. 2006).  United argues that Plaintiff failed to prove that any of these symptoms or conditions are disabling under the terms of the plan.  As previously discussed, an element of the definition of disability is a "significant change" in a claimant's functional capacity.  Based on the record, United's interpretation of the evidence that Plaintiff did not satisfy this element is not unreasonable.

Plaintiff's symptoms date back to at least 2001.  Between 2001 and the date of her claim in 2010, Plaintiff visited her primary care physicians for both routine and follow-up appointments regarding her medical complaints.  During that time, Plaintiff reported an array of symptoms and was placed on various medication regimens.  She was also functioning as a nurse anesthetist during this time, which is supported by the record.  On a March 26, 2009 visit, Dr. Patick identified Plaintiff's "active problems" as: pure hypercholesterolemia, generalized anxiety disorder, depressive disorder, benign hypertension, esophageal reflux, and osteoarthrosis.  LTD AR 611.  Yet, as Dr. Patick noted at that time, "she still works as a work [sic] anesthetist at Cabell and stays busy."  LTD AR 611.  In March 2008, Dr. Patick noted his medical impression of Plaintiff as having hypertension, hyperlipidemia, history of Lyme disease, chronic depression, and chronic pain syndrome.  Those symptoms are similar to those of which she complained in her disability claim.  Yet at that time, as Dr. Patick observed, "she is still busy working as a nurse anesthesiologist."  LTD AR 605.  In March 2007, Plaintiff again followed up with Dr. Patick for her symptoms, specifically fatigue and leg weakness.  Dr. Patick noted that "she is still working as a nurse anesthesiologist and things are working out."  LTD AR 602.  In an August 2007 visit for her symptoms, specifically aches in her wrists and ankles, she was again "working

hard as a nurse anesthesiologist" at that time. LTD AR 600. Plaintiff's doctors subsequently reported a declining or worsening of her condition. LTD AR 212 (Dr. Zekan stating, "I have observed her physical and cognitive decline, step by step"); LTD AR 220 (Dr. Patick stating, "I expect continued decline of physical + cognitive function"). The record, however, indicates that the decline is evidenced by Plaintiff's self-reported description of the extent of her symptoms and not the appearance of new symptoms or new objective medical evidence.

This conclusion is further supported by Plaintiff's vocational history as reported by Mr. Bowen. LTD AR 338. She worked at CHH as a registered nurse for 14 years. From 1994 to 1999, she worked as a nurse anesthetist for Huntington Anesthesiologist Group. She reported quitting that job "because she was experiencing extreme fatigue, migraines, muscle weakness and short term memory problems." LTD AR 338. Plaintiff believed that she may function better at a job with fewer hours, so she began working as a CRNA in Charleston, presumably a position with fewer required hours. She worked there until 2005. "She continued to experience chronic fatigue, neurological symptoms and migraine headaches throughout her employment." LTD AR 338. It appears, therefore, that Plaintiff experienced these same symptoms for at least six years prior to her employment at CHH, all while successfully working as a CRNA or registered nurse. LTD AR 338. Given this background, it was reasonable for United to question whether Plaintiff's symptoms qualified as a "significant change" in her condition that resulted in a disability under the plan.

Substantial evidence exists in the record for United to reasonably conclude that Plaintiff's symptoms are not disabling according to the terms of the LTD Plan. In addition to the evidence discussed above, cardiac stress tests performed in January 2010 returned normal results. The physician who administered the test noted "the treadmill [test] demonstrates excellent exercise

tolerance."  LTD AR 544.  Dr. Crossley (United's retained physician) suggested that "her health/cognitive issues may have a possible origin in mental health issues."  LTD AR 448. United followed up on this suggestion and retained an independent neuropsychologist to follow up on that possibility on appeal.  That consultant, Dr. Olander, questioned the validity of some of the psychological exams as administered to Plaintiff and ultimately concluded that she was not disabled.  Plaintiff's submitted psychological evaluations do not necessarily directly contradict Dr. Olander's conclusion.  Mr. Bowen wrote "Ms. Childers reports that she is unable to work . . . ," LTD AR 343, but he did not definitively reach that same conclusion himself.  Instead, he believed that further evaluation would be necessary, recommending "that Ms. Childers undergo a Neuropsychological evaluation to better identify her neurological deficits and to gain a better understanding of how they affect her ability to work and care for herself."  LTD AR 343. Another psychologist who submitted a report on Plaintiff's behalf, Dr. Mulder, did not state any view on whether Plaintiff's condition prevented her from performing her job duties.  LTD AR 347.  It was not an abuse of discretion, therefore, for United to determine that Plaintiff did not satisfy her burden to prove that she was disabled by any mental health condition, especially where psychologists who examined her did not reach that conclusion.

Finally, Plaintiff also submitted letters attesting to her integrity and inability to perform her job duties.  LTD AR 388-408.  These letters came from physician-friends, her CRNA supervisor, fellow CRNAs, family members, and her hair stylist.  None of these letters of support, however, provide the type of evidence required by the LTD Plan to satisfy proof of loss. Most of them attest to Plaintiff's good character and hardworking attitude.  Some describe the author's observation of the deterioration of Plaintiff's condition.  These testimonials are not the

46

type of evidence that outweighs the medical evidence and physical examination results in the record.

To summarize, the Court finds that the record contains substantial evidence to support United's determination. Under the deferential standard of review applicable in this case, the Court cannot conclude that United abused its discretion.

### c.    Result of a reasoned and principled decisionmaking process

Next, the Court turns to United's decisionmaking process. The Court must determine whether the process United employed to reach its decision regarding Plaintiff's LTD claim was reasoned and principled. Plaintiff argues that United's decisionmaking process was flawed because it: (1) failed to give appropriate weight to the opinions of Plaintiff's treating physicians; (2) failed to have its consulting physicians personally examine Plaintiff; and (3) failed to consider the favorable decision of the Social Security Administration declaring Plaintiff to be disabled.

The administrative record contains numerous conclusions and opinions from Plaintiff's treating physicians that she is unable to work due to disability. *See* LTD AR 716 (Dr. Patick stating that Plaintiff's "[r]ecovery [is] doubtful – [g]oal is improved [q]uality of [l]ife"); LTD AR 490 (Dr. Patick stating on November 2, 2010, that Plaintiff "is unable to work due to numbness and loss of control of her left knee"); LTD AR 499 (Dr. Darnall letter dated October 1, 2010, stating that Plaintiff "is unable to work due to cognitive dysfunction, which is presumed secondary to Lyme Disease"); LTD AR 482 (Dr. Zekan report dated August 10, 2010, stating Plaintiff is "unable to work till symptoms get better"). Under the ERISA framework, administrators may not arbitrarily refuse to credit reliable evidence, including the opinions of a treating physician, but administrators are not required to accord special deference to the opinions

47

of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Frankton v. Metropolitan Life Ins. Co.*, 432 Fed. App'x 210, 215 (4th Cir. 2011).  United referred Plaintiff's voluminous medical history to independent physicians, each of whom submitted detailed reports that concluded Plaintiff's records did not support a disability as defined by the plan.  The record demonstrates that United considered, but disagreed with, the opinions of Plaintiff's treating physicians.  Because the treating physicians' opinions are not entitled to special deference, United did not abuse its discretion by crediting the opinions of its doctors, which are supported by substantial evidence.

Second, there is no requirement that claims administrators have their own consulting physicians conduct personal examinations of claimant.  The LTD plan in this case does not specifically require a personal examination, either.  LTD AR 29 ("We *sometimes* require that a claimant be examined by a Physician . . . .") (emphasis added).  Because "there is no *per se* rule in the law requiring that a plan administrator must conduct an independent medical examination before denying benefits," it was not unreasonable for United to rely on the opinions of non-treating physicians in making its award decision.  *Piepenhagen v. Old Dominion Freight Line, Inc.*, 640 F. Supp. 2d 778, 792 (W.D. Va. 2009), *aff'd* 395 F. App'x 950 (4th Cir. 2010).

Third, United did not act unreasonably by refusing to give weight to the determination of the Social Security Administration ("SSA") to award Plaintiff social security disability benefits.[8] As explained in the letter affirming the denial of Plaintiff's LTD claim, the definition of "disability" is different for each benefit system.[9]  *See also Smith v. Continental Cas. Co.*, 369

---

[8] The August 26, 2011 social security decision, LTD AR 310-18, was issued after United first denied Plaintiff's claim.  Consequently, it was not available for United to consider for Plaintiff's initial claim.  Plaintiff provided the decision to United during the appeal phase of her claim.

[9] For purposes of social security, "disability" is defined as:

F.3d 412, 420 (4th Cir. 2004) (holding that the district court erred by importing social security definitions into its consideration of an ERISA benefit claim because "what qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit plan").  United is not obligated to weigh SSA's disability determination more favorably than the other evidence in the record.  *Frankton v. Metropolitan Life Ins. Co.*, 432 Fed. App'x 210, 215 (4th Cir. 2011) (citing *Gallagher*, 305 F.3d at 275.  This is especially true where, as United points out, the SSA decision cited potentially unreliable sources like Wikipedia to justify its award decision.  Furthermore, the SSA review process did not include the consultation of an independent physician.

There is no evidence that United otherwise engaged in an unreasonable review process.  By all indications, United implemented fair measures to allow full consideration of Plaintiff's claim.  For example, United adjusted the timeframe within which it analyzed Plaintiff's claim.  Plaintiff indicated on her LTD claim form that the date she was first unable to work was July 17, 2010.  LTD AR 728.  United later learned, however, that Plaintiff had actually stopped or decreased her work hours beginning October 2008, using Family Medical Leave Act ("FMLA") time.  Taking that information into account, "to give [Plaintiff's] claim the fullest consideration," United asked its reviewers whether "the medical documentation indicate[s] the insured would have been precluded from performing at least one of the Material Duties of her regular occupation on part-time or full-time basis beginning 10/2008?"  LTD AR 735.  United

---

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

voluntarily analyzed Plaintiff's claim based on the earlier date, which is to Plaintiff's benefit under this plan, where time is an important element of the definition of "disability."[10]

Additionally, United demonstrated a willingness to fully consider supplemental materials provided by Plaintiff in support of her claim. On July 19, 2011, Plaintiff provided United with supplemental documents for it to consider on the appeal of Plaintiff's claim. LTD AR 329-408. These documents included completely new medical reports and exam results from two psychologists, and a report from an occupational disability consultant, all of which were performed after the initial denial of benefits. Two months later, Plaintiff supplemented the record with the favorable SSA decision. Plaintiff then sought an extension of time to provide additional medical reports. While United did not grant Plaintiff the full 60-day extension she sought,[11] it did grant nearly three weeks' additional time for Plaintiff to respond to the independent physicians' reports. LTD AR 260-61. Plaintiff supplemented the record two additional times, with additional medical reports from three physicians. United not only gave Plaintiff the opportunity to provide additional evidence in support of her claim, but also referred that additional evidence to its independent physician consultants (in the case of the social security decision) and asked them to amend their original reports. The evidence shows that United considered all of the original and supplemental materials that Plaintiff provided when reaching its decision. *See* LTD AR 170-72 (identifying all the records it considered).

---

[10] While United asked its initial reviewers to analyze Plaintiff's claim dating back to 2008, it did not ask its reviewers on appeal to do so. LTD AR 802 & 788 (medical record review reports of Doctors McQuillen and Olander listing the referral question, "What restrictions and limitations are supported by the records, examinations, and diagnostic tests *as of 7/16/10* and currently?") (emphasis added). These reviewers on appeal, however, analyzed the same medical records as the initial reviewer, which spanned over ten years of Plaintiff's medical records. Their consideration of the record, therefore, included the earlier 2008 period.

[11] United stated that the "time frames established by ERISA" prevented it from granting the long extension sought. LTD AR 260.

Therefore, this element does not weigh in favor of concluding that United's decision was unreasonable.

### d.      Conflict of interest

Plaintiff argues that United acted in its own interest by denying Plaintiff's claim and thus abused its discretion.  It is true that there is a conflict of interest here, because United is both the claims administrator and the payor of benefits.  As noted *supra*, however, the existence of a conflict of interest is only one factor among many to be considered and the mere fact that a conflicted defendant denied a claim does not by itself indicate an abuse of discretion.  The Court cannot conclude, based on the record here, that United's conflict of interest rendered its decision unreasonable, or that it otherwise unduly influenced its decision.

United considered the evidence arguably in Plaintiff's favor; it did not wholly disregard such evidence.  *See Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 326 (4th Cir. 2008) (citing *Donovan v. Eaton Corp.*, 462 F.3d 321, 329 (4th Cir. 2006)) (rejecting claimant's argument that it is impermissible for an administrator to select medical evidence in its own favor, observing that "what rightly offended the *Donovan* court was not [the administrator's] selectivity (which is part of a plan administrator's job), but its "wholesale disregard" of evidence in the claimant's favor").  For example, United's 14-page denial letter systematically summarized more than ten years of Plaintiff's medical records, including the treating physician's diagnosis and prescribed treatment.  LTD AR 414-26.  The review noted certain evidence Plaintiff argues is favorable to her, including that "[t]esting for Human Erlichiosis IgG showed a positive titer and Lyme Western Blot was positive on August 31, 2001."  LTD AR 418.  The letter specified all of Plaintiff's diagnoses over the years, identified what her medical tests did and did not show, and ultimately concluded that there is a "lack of

51

medical evidence to support an exacerbation of chronic medical conditions or a change in your medical status," as is required to prove "disability" as it is defined in the plan.  LTD AR 423. The Court concludes that United considered all the evidence, including the evidence in Plaintiff's favor, and the conflict did not improperly influence its decision.

United hired three independent consultants[12] to review Plaintiff's medical records and disability claim and relied on their evaluations in making its determination.  Plaintiff challenges the credibility of these physicians' reports, specifically those of the two physician reviewers on appeal.  Plaintiff argues that these individuals, both associated with the group University Disability Consortium ("UDC"), are not truly independent and the Court should view their reports with skepticism.  In support of her argument, Plaintiff cites two California federal district court cases where the district courts viewed the reports of physicians associated with UDC with "commensurate skepticism," citing certain UDC marketing materials that allegedly implied that its physicians would issue reports favorable to the administrator.  *Caplan v. CAN Fin. Corp.*, 544 F. Supp. 2d 984, 992 (N.D. Cal. 2008); *see also Velikanov v. Union Security Ins. Co.*, 626 F. Supp. 2d 1039 (C.D. Cal. 2009).  The record before the court in *Caplan* implied that the reviewing UDC physician had a financial motivation to issue a report favorable to the administrator.  No such evidence is before this Court.  Plaintiff has offered no evidence from which this Court could properly conclude that the UDC physicians in this case rendered anything other than an independent review.  The Court, therefore, finds that it was not unreasonable for United to refer Plaintiff's claim to physicians affiliated with UDC.  It is common practice to do so.  *See Toothman v. Bob Evans Farms, Inc.*, Civil Action No. 2:08-1037, 2009 WL 4927866, at *10 (S.D. W. Va. Dec. 14, 2009) ("It is now common for administrators to rely upon the

---

[12] Plaintiff's initial claim was forwarded to one physician for review.  United referred her claim on appeal to two independent consultants.

reasoned opinions of non-examining, independent medical professionals in the benefits determination process."). There is no basis to impose a higher level of scrutiny to United's referral or the independent physicians' conclusions. Moreover, Plaintiff complained only of the two independent physicians who reviewed Plaintiff's claims on appeal. The independent physician who reviewed Plaintiff's claim for the initial claim determination was not affiliated with UDC and reached the same conclusion—that Plaintiff did not meet the definition of disabled under the plan.

Therefore, it appears to the Court that the conflict of interest did not improperly influence United's decision and consideration of this factor therefore does not support the conclusion that United abused its discretion.

### 3.   Conclusion

The Court concludes that United's decision to deny Plaintiff's claim for LTD benefits was the result of a deliberate, principled reasoning process and was supported by substantial evidence. Therefore, the Court **GRANTS** Defendant United of Omaha's motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment.

### III.   CONCLUSION

After a thorough review of the administrative records in this case, the Court concludes that Plaintiff did not meet the criteria for either STD benefits or LTD benefits. Although the Court applied a different standard of review to each claim, Plaintiff is not entitled to benefits under either plan. For the reasons stated above and because there exists no genuine issue of material fact, the Court must **GRANT** summary judgment in favor of Defendants CHH and United of Omaha and **DENY** Plaintiffs' motions for summary judgment against both defendants.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        February 22, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE